AO 91 (Rev. 11/82)

## CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA | CLERK, U.S. DISTRICT COURT |
| v. | |
| CHRISTOPHER ALAN HOFF, | MAGISTRATE'S CASE NO. |
| also known as "Leonard Shemtob" | 15-2257M |

DOCKET NO.

NOV 18 2015

CENTRAL DISTRICT OF CALIFORNIA
BY_____ DEPUTY

Complaint for Violation of Title 18, United States Code, Section 1704

| NAME OF MAGISTRATE JUDGE | | LOCATION |
|---|---|---|
| THE HONORABLE JACQUELINE CHOOLJIAN | UNITED STATES MAGISTRATE JUDGE | Los Angeles, California |

| DATE OF OFFENSE | PLACE OF OFFENSE | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|
| November 15, 2015 | Los Angeles County | |

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

### [18 U.S.C. § 1704]

On or about November 15, 2015, in Los Angeles County, within the Central District of California, defendant CHRISTOPHER ALAN HOFF, also known as "Leonard Shemtob," knowingly possessed with the intent to unlawfully and improperly use, and to cause the same to be unlawfully and improperly used, a key to a lock box, lock drawer, or other authorized receptacle for the deposit or delivery of mail matter adopted by the Post Office Department or the Postal Service, namely, a postal "arrow" key.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint.)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT |
|---|---|
| | JAMES KEENAN /S/ |
| | OFFICIAL TITLE |
| | Postal Inspector, United States Postal Inspection Service |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE[1] | DATE |
|---|---|
| JACQUELINE CHOOLJIAN | November 18, 2015 |

[1] See Federal Rules of Criminal Procedure 3 and 54

AUSA Lindsey Greer Dotson (x4443)          REC: Detention

## AFFIDAVIT

I, JAMES KEENAN, being duly sworn, declare and state as follows:

### I.   INTRODUCTION

1.    I am a Postal Inspector with the United States Postal Inspection Service ("USPIS") and have been so employed since June 2015.  I am currently assigned to the Los Angeles Division Mail Theft Team, which investigates crimes against the United States Postal Service ("USPS") and crimes related to the misuse and attack of the mail system, including theft of United States mail, fraud, and related activity in connection with access devices (including credit and debit cards), identity theft, and unauthorized use of other persons' information for financial gain.  I completed a basic training course in Potomac, Maryland. That course included training in the investigation of identity theft via the United States Mail.  Prior to becoming a Postal Inspector, I worked as a Customs and Border Protection Officer at the San Ysidro Port of Entry for approximately three years. I also completed a six-month basic training course at the Federal Law Enforcement Training Center.  Based on my discussions with other Postal Inspectors, specifically Mail Theft Team Leaders, who combined have over 20 years of experience, I have learned about mail theft investigations and common mail theft and identity theft practices.

### II. PURPOSE OF AFFIDAVIT

2.    This affidavit is made in support of a criminal complaint against and an arrest warrant for CHRISTOPHER ALAN

HOFF, also known as "Leonard Shemtob" ("HOFF"), for a violation of 18 U.S.C. § 1704 (Unlawful Possession of an Arrow Key).

3.   The facts set forth in this affidavit are based on my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and arrest warrant, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III. SUMMARY OF PROBABLE CAUSE

4.   Based on my review of investigation reports and debriefings with other law enforcement officers, I am aware that on or about November 15, 2015, Los Angeles Police Department ("LAPD") officers responded to a burglary and found HOFF in possession of a counterfeit "arrow key."  Arrow keys are used by USPS mail carriers to unlock USPS arrow locks, in order to gain access to housing complexes or apartment buildings and deliver mail to the respective mailboxes found inside.  In a Mirandized statement, HOFF said that he used the counterfeit arrow key to enter the apartment building, intending to steal mail.  He stated that he was looking for credit cards, which he could sell to a friend, and had stolen mail from this apartment building in the past.

## IV.   STATEMENT OF PROBABLE CAUSE

### A.   Arrest of HOFF

5.   Based on my review of investigation reports and debriefings with other law enforcement officers, I am aware of the following:

a.   According to the arrest report and my conversations with other law enforcement officers, on or about November 15, 2015, Victor Grant ("Grant") stated that he was working as the manager of an apartment building.  Grant was monitoring the security cameras when he observed a man (later identified as HOFF) enter the apartment building through the front door.  Grant saw HOFF open multiple mailboxes with a key. Grant confronted HOFF, who attempted to flee.  Grant detained HOFF by tackling him to the ground.  Other witnesses heard the commotion and assisted with the detention of HOFF.

b.   From the arrest report, I know that LAPD officers arrived shortly thereafter and arrested HOFF for Residential Burglary.

### B.   Arrow Key and Mail Matter Found During Search of HOFF

6.   Based on my review of investigation reports and debriefings with other law enforcement officers, I am aware of the following:

a.   During a search incident to arrest, the officers found a counterfeit arrow key on the ground next to HOFF, which HOFF said was his.  From my training and experience, I know that arrow keys are keys used by USPS mail carriers to unlock USPS arrow locks, in order to gain access to housing complexes or

3

apartment buildings and deliver mail to the respective mailboxes found inside.  USPS arrow keys are also sometimes used to gain access to mail collection boxes in a specific area.  I know that persons involved in theft of mail and related offenses often have genuine or counterfeit arrow keys in their possession.

b.    According to the arrest report, the counterfeit arrow key found in HOFF's possession could be used to access the apartment building referenced in paragraph 5.

c.    From the arrest report, I also know that the officers found, among other things, credit and debit cards in names other than HOFF inside of HOFF's jacket and wallet.  Based on my training and experience, mail thieves steal mail in order to obtain items of value, like credit and debit cards, in order to sell those items or make fraudulent purchases.

C.    HOFF's Statements Regarding Mail Theft

7.    Based on my review of investigation reports and debriefings with other law enforcement officers and Postal Inspectors, I am aware of the following:

a.    From the arrest report and my conversations with law enforcement officers, I know that HOFF was advised of his Miranda rights and agreed to be interviewed.

b.    According to the arrest report, HOFF stated that he used the counterfeit arrow key on November 15, 2015 to open the front door of the apartment building referenced in paragraph 5.  HOFF said that he intended to steal mail in order to obtain credit cards, which he could then sell to a friend.  HOFF stated

that he found no mail in the mailboxes, so he decided to leave. When confronted by the apartment manager, HOFF fled.

     c.   From the arrest report, I know that HOFF later stated that he actually stole a FedEx envelope containing a credit card from the apartment building.  At the time of his arrest, the officers found a Visa card with an activation slip in HOFF's possession.  The address on the activation slip was the same address as the apartment building.

     d.   According to the arrest report, HOFF also told the officers that this was not his first time stealing mail from this apartment building.  On a prior occasion, he also entered the apartment building and stole mail.

     e.   In addition, from conversations with law enforcement officers and my review of the arrest report, I know that HOFF also told the officers that he purchased a counterfeit driver's license from MacArthur Park for $50.  The officers found this counterfeit license in HOFF's possession at the time of his arrest.  The license had HOFF's picture and the name "Leonard Shemtob."  HOFF was also in possession of a credit card in the name of Leonard Shemtob.  Based on my training and experience, I am aware that individuals involved in mail theft and related identity theft crimes may use a counterfeit form of identification in order to be able to use credit and debit cards stolen from the mail.

**D.   Prior Mail Theft**

   8.   Based on my review of investigation reports, debriefings with other law enforcement officers and Postal

Inspectors, and review of a search warrant application and affidavit attached hereto as Exhibit 1, I am aware of the following:

   a. On or about May 28, 2015, Los Angeles School Police Department officers conducted a traffic stop of HOFF's vehicle and arrested HOFF on an outstanding arrest warrant.  A subsequent search of HOFF's vehicle revealed evidence of mail theft and related crimes, including stolen mail and mail matter. The officers also found a United States Letter Carrier uniform and USPS satchel.  HOFF was not a USPS employee.

   b. Postal Inspector Lee Versoza prepared an affidavit for a warrant to search the mobile devices found in HOFF's possession.  That search warrant application and supporting affidavit are attached hereto as Exhibit 1.

///

///

///

## V.   CONCLUSION

9.   For the reasons described above, there is probable cause to conclude that CHRISTOPHER ALAN HOFF has committed a violation of 18 U.S.C. § 1704 (Unlawful Possession of an Arrow Key).

/s/
_____
JAMES KEENAN
United States Postal
Inspector, United States
Postal Inspection Service

Subscribed to and sworn before me
this _18_ day of November, 2015.

JACQUELINE CHOOLJIAN

_____
HONORABLE JACQUELINE CHOOLJIAN
UNITED STATES MAGISTRATE JUDGE

EXHIBIT 1

AO 106 (Rev. 04-10) Application for a Search Warrant (USAO CDCA Rev. 01/2013)

# UNITED STATES DISTRICT COURT

for the

Central District of California

FILED
CLERK, U.S. DISTRICT COURT

JUN 1 8 2015

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

Devices seized on May 28, 2015 in the custody of the United States Postal Service

)
)
)
)
)
)

Case No. 15 - 1153 M

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the        Central        District of        California        , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Sections 1708 (Theft or Receipt of Stolen Mail), 1343 (Wire Fraud), 1344 (Bank Fraud), 1028 (Identity Theft) and 1029 (Access Device Fraud) | See attached Affidavit |

The application is based on these facts:

See attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of        days (give exact ending date if more than 30 days:        ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/
*Applicant's signature*

Lee Versoza - United States Postal Inspector
*Printed name and title*

Sworn to before me and signed in my presence.

Date:    6/18/15

*Judge's signature*

City and state:  Los Angeles, California

Suzanne H. Segal, U.S. Magistrate Judge
*Printed name and title*

AUSA: Annamartine Salick

ATTACHMENT A

PROPERTY TO BE SEARCHED

The following digital devices (the "SUBJECT DEVICES"),
seized on May 28, 2015 and currently maintained in the custody
of the United States Postal Inspection Service in Los Angeles,
California:

a.   a black Sony Xperia Smartphone that measures
approximately 7.5 inches by 4 inches with a cracked screen
(SUBJECT DEVICE I);

b.   a Samsung SGH-T399N Smartphone, Serial Number
354796/06/768004/6 (SUBJECT DEVICE II); and

c.   a LG MetroPCS LGMS323 smartphone, Serial Number
411KPYR569586 (SUBJECT DEVICE III).

ATTACHMENT B

I.   ITEMS TO BE SEIZED

1.   All records relating to violations of Title 18, United States Code, Section 1708 (Theft or Receipt of Stolen Mail); Title 18, United States Code, Section 1343 (Wire Fraud); Title 18, United States Code, Section 1344 (Bank Fraud); Title 18, United States Code, Section 1028 (Identity Theft); Title 18, United States Code, Section 1029 (Access Device Fraud); (the "Subject Offenses") those violations involving Christopher Allen Hoff ("HOFF") and occurring between May 2015, and the present, namely:

a.   Records relating to counterfeit, fraudulent or altered checks, credit cards, debit cards, gift cards and/or forms of identification.

b.   Any documents or records containing personal identification information associated with individuals other than HOFF, including:

i.   Credit card, debit card, or gift card account numbers, true account holder names, expiration dates, "CVV" or account verification or authentication numbers, and true account holder name addresses and telephone numbers;

ii.   Personal identification numbers ("PINs");

iii.   Addresses, dates of birth, and vital records such as birth or death certificates;

iv.   Social Security Numbers; and

Instrumentality Protocol

i

v.   Driver's license numbers.

c.   Records relating to purchases or returns of merchandise or services using numbers for credit cards, debit cards, or gift cards, or purchases or uses of gift cards, or showing names or other personal identifying information of individuals who purchased or returned goods using fraudulent checks, unauthorized access devices, or other fraudulent or altered monetary instruments, numbers for credit cards, debit cards, or gift cards, or whose identities were used to purchase goods with such cards.

d.   Any bank, financial, or other records, documents, programs, applications, or materials (including ledgers, financial statements, invoices, or other records), reflecting income, expenses incurred by and disbursements by HOFF and/or any other individual involved in manufacturing, distributing, or using:

i.    False identification cards;

ii.   Fraudulent credit cards, debit cards, or gift cards; and

iii.  Numbers for credit cards, debit cards, or gift cards; and

iv.   Altered checks

e.   Communications between HOFF and/or any other individual involved in stealing U.S. Mail, or manufacturing, distributing, or using false identification cards, fraudulent credit cards, or credit card numbers, or altered checks.

Instrumentality Protocol

ii

f.    Communications with or activity involving websites or other business or individuals that sell or traffic in stolen credit account information or checking account information.

g.    Records relating to ownership, control, and possession or any personal identification information purporting to pertain to HOFF, but actually belonging to any other individual, including Social Security Numbers, driver's license numbers, PIN's, addresses, dates of birth, vital records.

h.    Records relating to contracts, applications, leases, invoices, facsimiles, and/or electronic mail that show or evidence rental agreements and/or payment for storage facilities or units, building space, shipping containers, post offices boxes, and safety deposit boxes, including records pertaining to keys or other access devices for such locations.

i.    Any documents or records relating to any bank accounts, credit card accounts, or other financial accounts belonging to any individual that is not HOFF.

j.    Any documents or records relating to the creating, alteration, counterfeiting, or sale of identification documents, identification cards, checks, access devices, monetary instruments, or other government-issued forms of identification.

k.    Any documents or records evidencing the negotiation or deposit of altered, counterfeit, or fraudulent checks or other monetary instruments.

Instrumentality Protocol

1.    Any identification documents, checks, access devices, monetary instruments, or other government-issued or financial institution documents that are not addressed to, or in the name of HOFF.

m.    Any SUBJECT DEVICE used to facilitate the above listed violations (and forensic copies thereof).

2.    With respect to any SUBJECT DEVICES used to facilitate the above-listed violations or containing evidence falling within the scope of the foregoing categories of items to be seized:

a.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

b.    evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.    evidence of the attachment of other devices;

d.    evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

e.    evidence of the times the device was used;

Instrumentality Protocol

iv

f.   passwords, encryption keys, and other access devices that may be necessary to access the device;

g.   applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

h.   records of or information about Internet Protocol addresses used by the device;

i.   records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

II.  SEARCH PROCEDURE FOR DIGITAL DEVICE(S)

3.   In searching the SUBJECT DEVICES (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may search any SUBJECT DEVICE capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

b.   The search team will, in its discretion, either search each SUBJECT DEVICE where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

Instrumentality Protocol

v

c. The search team shall complete the search of the SUBJECT DEVICES as soon as is practicable but not to exceed 60 days from the date of issuance of the warrant. If additional time is needed, the government may seek an extension of this time period from the Court on or before the date by which the search was to have been completed.

d. The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

a. The search team may subject all of the data contained in each SUBJECT DEVICE capable of containing any of the items to be seized to the search protocols to determine whether the SUBJECT DEVICE and any data thereon falls within the scope of the items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

b. The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

e. The search team shall make and retain notes regarding its search of the SUBJECT DEVICES.

f. If the search team, while searching a SUBJECT DEVICE, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that

Instrumentality Protocol

vi

SUBJECT DEVICE pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

g.   If the search determines that a SUBJECT DEVICE does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the SUBJECT DEVICE and delete or destroy all forensic copies thereof.

h.   If the search determines that a SUBJECT DEVICE does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

i.   If the search determines that the SUBJECT DEVICE is (1) itself an item to be seized and/or (2) contains data falling within the list of items to be seized, the government may retain forensic copies of the SUBJECT DEVICE but may not access them (after the time for searching the device has expired) absent further court order.

j.   The government may retain a SUBJECT DEVICE itself until further order of the Court or one year after the conclusion of the criminal investigation or case (whichever is latest), only if the SUBJECT DEVICE is determined to be an instrumentality of an offense under investigation or] the government, within 14 days following the time period authorized by the Court for completing the search, obtains an order from the Court authorizing retention of the SUBJECT DEVICE (or while

Instrumentality Protocol

an application for such an order is pending).  Otherwise, the
government must return the SUBJECT DEVICE.

        k.   Notwithstanding the above, after the completion
of the search of the SUBJECT DEVICE(S), the government shall not
access digital data falling outside the scope of the items to be
seized absent further order of the Court.

    4.   The special procedures relating to digital devices
found in this warrant govern only the search of digital devices
pursuant to the authority conferred by this warrant and do not
apply to any search of digital devices pursuant to any other
court order.

## AFFIDAVIT

I, Lee Versoza, being duly sworn, declare and state as follows:

### I.    INTRODUCTION

1.    I am a United States Postal Inspector ("USPI") employed by the Los Angeles Division of the United States Postal Inspection Service ("USPIS"). I have been so employed since 2006. My responsibilities as a member of the Mail Theft team include the investigation of crimes against the United States Postal Service ("USPS") and crimes related to the misuse and attack of the mail system, including theft of United States mail, possession of stolen United States mail, access device fraud and identity theft. I have received both formal and informal training from the USPIS regarding mail theft and identity theft.

### II.  PURPOSE OF AFFIDAVIT

2.    This affidavit is made in support of an application for a warrant to search the following digital devices in the custody of United States Postal Service:

    a.    a black Sony Xperia Smartphone that measures approximately 7.5 inches by 4 inches with a cracked screen ("SUBJECT DEVICE I");

    b.    a Samsung SGH-T399N Smartphone, Serial Number 354796/06/768004/6 ("SUBJECT DEVICE II"); and

    c.    a LG MetroPCS LGMS323 smartphone, Serial Number 411KPYR569586 ("SUBJECT DEVICE III");

Instrumentality Protocol

(collectively, the "SUBJECT DEVICES").  The requested search warrant seeks authorization to seize any data on the SUBJECT DEVICES that constitutes evidence or fruits of violations of Title 18, United States Code, Section 1708 (Theft or Receipt of Stolen Mail); Title 18, United States Code, Section 1343 (Wire Fraud); Title 18, United States Code, Section 1344 (Bank Fraud); Title 18, United States Code, Section 1028 (Identity Theft); Title 18, United States Code, Section 1029 (Access Device Fraud); (the "Subject Offenses") or any SUBJECT DEVICE that is itself an instrumentality of the Subject Offenses.

3.    The SUBJECT DEVICES are identified in Attachment A to the search warrant application.  The list of items to be seized is set forth in Attachment B to the search warrant application. Attachments A and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III. STATEMENT OF PROBABLE CAUSE

5.    On May 28, 2015, a man later identified as Christopher Alan Hoff ("HOFF") was arrested on an outstanding arrest warrant and a search of his vehicle revealed evidence of mail theft and

Instrumentality Protocol

related crimes, including numerous mail items, a United States
Letter Carrier uniform, a USPS satchel, and three mobile
devices.  I now seek authority to search the three mobile
devices, the SUBJECT DEVICES, retrieved from HOFF's vehicle for
evidence of the Subject Offenses.

6.    On May 28, 2015, I spoke with Los Angeles School
Police Department Sergeant Jose Rios, reviewed an arrest report
and learned the following information:

a.    Earlier that day, Sergeant Rios was driving an
unmarked police unit near The Roybal Learning Center, located at
1200 West Colton Street in Los Angeles, California.  Sergeant
Rios observed a dark gray, four-door Dodge 200 (the "Dodge"),
speeding and running a red light.  Sergeant Rios initiated a
traffic stop and asked the driver, later identified as HOFF, to
turn off the vehicle and provide his driver's license.  HOFF
said he did not have a driver's license or any photo
identification on his person and that the car was a rental.
Sergeant Rios returned to his police vehicle and requested
additional units respond to his location.

b.    A second Los Angeles School Police Department
Officer, Officer Sergio Salazar, responded to the scene.   HOFF
was handcuffed and told he was being detained for driving
without a license.  HOFF was escorted to Officer Salazar's
police car and seated in the rear seat.

c.    Officer Salazar contacted the Hertz Rental
Company and was told by the service representative that the
vehicle was rented in another individual's name and that the car

Instrumentality Protocol

3

had been scheduled to be returned to Hertz on May 14, 2015.  The
representative told Officer Salazar that Hertz Rental Company
had been trying to locate the vehicle.

       d.   A third Los Angeles School Police Department
Officer, Officer Henry Salcedo, also responded to scene.
Officer Salcedo asked HOFF for identification.  At first, HOFF
gave Officer Salcedo a false name, date of birth, and address,
and stated that he could not remember his phone number.
Officer Salcedo then read HOFF his Miranda Rights.  HOFF
answered "yes" to each Miranda warning and agreed to speak with
the officers.

       e.   HOFF admitted that he told the officers false
information.  He then provided the officers with his true name,
correct date of birth, and an address in Long Beach, California.
HOFF stated that he had been arrested for burglary, that he had
not been in contact with his post community supervisor, and that
he believed he had an outstanding warrant for his arrest.  The
officers ran HOFF through a law enforcement database and learned
that there was an outstanding warrant for his arrest.

       f.   Officer Salcedo informed HOFF that he was being
arrested on an outstanding arrest warrant.

       g.   Officer Salcedo impounded the Dodge and conducted
an inventory search of the vehicle.  During the inventory
search, he located and took custody of the SUBJECT DEVICES.  He
also took custody of several mail envelopes including a Priority
Express Mail letter, which had the delivery address ripped off
from the envelope, and other letters bearing names and addresses

Instrumentality Protocol

4

different from HOFF.  In addition, Officer Salcedo found a
United States Letter Carrier uniform, a United States Postal
Service satchel, and a dark brown woman's wig in the vehicle.
Officer Salcedo also recovered a glass methamphetamine pipe and
a small clear plastic wrapper containing a clear crystal solid
substance resembling crystal methamphetamine.

7.  On the afternoon of May 28, 2015, U.S. Postal
Inspector Lynette Thompson and I responded to the Los Angeles
Police Department Rampart Station and met with the School Police
Officers.  I took custody of mail and mail matter from the
officers and observed that a number of the mail pieces came from
the Hollywood and West Hollywood neighborhoods.  Based on my
training and experience and observation of the addresses, I
believe that the seized mail came from apartment buildings and
that these apartment buildings require a U.S. Postal Service-
issued key (or a counterfeit key) to open the buildings' mail
boxes.

8.  On or about May 28, 2015, I spoke with a United States
Postal Inspection Service General Analyst who informed me that
Christopher Hoff was not a USPS employee.

9.  On May 28, 2015, I spoke with the intended recipient
of the Priority Mail Express parcel found in the Dodge.  The
recipient informed me that she was expecting the Priority
Express Mail package and that it contained important documents.
The recipient stated that she did not know Christopher Hoff and
that she never gave him permission to access her mail.

Instrumentality Protocol

5

10.  On June 1, 2015, US Postal Inspector Thompson and I went to an apartment building located in Hollywood, California, the address of which was listed on some of the mail items recovered from the Dodge and spoke with the apartment manager. The apartment manager stated that on May 27, 2015, at approximately 6:00 pm, he observed a suspicious person accessing the apartment's panel mailboxes using a key.  The person was wearing a U.S. Postal Service shirt and was carrying a U.S. Postal Service satchel.  The apartment manager did not recognize the individual as the regular letter carrier.  The manager used his cell phone to record the suspicious individual.

11.  U.S. Postal Inspector Thompson showed the apartment manager a picture of HOFF and the manager said that he was ninety-nine percent sure that the person in the photo was the same person as the suspicious individual he observed tampering with the apartment panel mailboxes on May 27, 2015.

12.  On June 1, 2015, I spoke with the apartment manager a second time and learned that he also manages another building in the West Hollywood neighborhood. He stated that he went to the other building and reviewed the apartment complex's closed-circuit surveillance video footage from May 27, 2015. He said that the man in this video looked like the man he observed accessing the apartment panel mailboxes at the other apartment complex that he manages.  The manager said that the video showed the suspect leave the apartment complex and enter a four-door, dark gray colored car.

Instrumentality Protocol

13.  On June 1, 2015, I also spoke with a resident of an apartment building in West Hollywood whose name and address appeared on one of the letters recovered from the subject's vehicle.  The resident stated that she did not know Christopher Hoff and that she never gave him permission to access her mail.

14.  On June 2, 2015, I spoke with a resident of an apartment complex whose name and address appeared on a letter recovered from the Dodge.  The resident stated that she did not know Christopher Hoff and that she never gave him access to her mail.

15.  On June 3, 2015, U.S. Postal Inspector Thompson and I met with an apartment manager of another apartment complex in West Hollywood.  The manager provided us access to the apartment building's close-circuit surveillance video and I downloaded a portion of the video that depicted an individual attempting to access the apartment panel boxes of the building.  The individual resembled HOFF and also carried a USPS Satchel.

16.  That same day, I also reviewed the close-circuit surveillance video from another West Hollywood apartment building depicting a suspected mail theft incident.  The individual, who also resembled HOFF, used a key to open the apartment panel mailboxes and removed a parcel and placed it inside the USPS Satchel he carried.

17.  I know from training and experience that mail thieves often use mobile devices and other digital devices to facilitate offenses related to mail theft, including wire fraud, bank fraud, identity theft, access device fraud, and similar

Instrumentality Protocol

offenses.  Specifically, mail thieves utilize the mobile
applications or "apps" developed by banking institutions to
create fraudulent accounts or to access their victims' bank
accounts by using identifying information contained in stolen
mail.  Evidence of such use may remain on the digital devices
and can be retrieved during a search.

18.  I also know from my training and experience that mail
thieves use mobile phones and other digital devices and banking
applications on such devices to make fraudulent deposits and
withdrawals from their victims' accounts.  Mail thieves often
open multiple, fraudulent accounts through the mobile
applications and then remove funds from these accounts by
cashing altered checks or money orders, obtained through stolen
mail.  Evidence of such use may remain on the digital devices
and can be retrieved during a search.

19.  I also know from my training and experience that mail
thieves may use multiple phones when conducting fraudulent
mobile banking to conceal their identity.  By using these
applications, mail thieves can pose as the account user and
conduct unauthorized transactions without needing to present
themselves at a physical location.  Mail thieves may further
conceal their identity by using prepaid phones, provided by
service carriers like Metro PCS, which do not require users to
complete contracts or provide identifying information.

20.  I also know from my training and experience that mail
thieves often use mobile phones to communicate with others to

Instrumentality Protocol

effectuate mail theft and that evidence of these communications may be recovered from the digital devices.

21.  Because the SUBJECT DEVICES were recovered from a vehicle driven by an individual suspected of committing mail theft, and because the SUBJECT DEVICES were found alongside numerous mail items bearing the names and addresses of persons other than the individual driving the vehicle, and based on my knowledge of the ways mail thieves use digital devices to facilitate mail theft and related crimes, there is probable cause to believe that the SUBJECT DEVICES will contain evidence or fruits of the Subject Offenses.

IV.  <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

22.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that it is not always possible to search digital devices for digital data in a single day or even over several weeks for a number of reasons, including the following:

a.  Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment.  There are so many types of digital devices and software programs in use today that it takes time to conduct a thorough search.  In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the type of digital device, operating system, and software application being searched.

Instrumentality Protocol

b.    Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c.    From an internet search of the SUBJECT DEVICES I learned the following: SUBJECT DEVICE I has a minimum storage capacity of 2 gigabytes ("GB"); SUBJECT DEVICE II has a minimum storage capacity of 8GB; SUBJECT DEVICE III has a minimum storage capacity of 4GB.  A single megabyte of storage space is the equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.

d.    Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files saved to a hard drive can be stored for years with little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data.  Therefore, deleted files,

Instrumentality Protocol

or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file.  Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache.  The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content.  Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment.  Recovery also can require substantial time.

     e.   Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for

Instrumentality Protocol

11

by this warrant.  Those records will not always be found in
digital data that is neatly segregable from the hard drive image
as a whole.  Digital data on the hard drive not currently
associated with any file can provide evidence of a file that was
once on the hard drive but has since been deleted or edited, or
of a deleted portion of a file (such as a paragraph that has
been deleted from a word processing file).  Virtual memory
paging systems can leave digital data on the hard drive that
show what tasks and processes on the computer were recently
used.  Web browsers, e-mail programs, and chat programs often
store configuration data on the hard drive that can reveal
information such as online nicknames and passwords.  Operating
systems can record additional data, such as the attachment of
peripherals, the attachment of USB flash storage devices, and
the times the computer was in use.  Computer file systems can
record data about the dates files were created and the sequence
in which they were created.  This data can be evidence of a
crime, indicate the identity of the user of the digital device,
or point toward the existence of evidence in other locations.
Recovery of this data requires specialized tools and a
controlled laboratory environment, and also can require
substantial time.

      f.  Further, evidence of how a digital device has
been used, what it has been used for, and who has used it, may
be the absence of particular data on a digital device.  For
example, to rebut a claim that the owner of a digital device was
not responsible for a particular use because the device was

being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

23.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

V.   CONCLUSION

24.  For the reasons described above, I respectfully submit there is probable cause to believe that evidence, fruits, and instrumentalities of the Subject Offenses will be found in the SUBJECT DEVICES.

/s/

US Postal Inspector Lee Versoza
US Postal Inspection Service

Subscribed to and sworn before me
this /8 day of June, 2015.

HONORABLE       SUZANNE H. SEGAL
UNITED STATES MAGISTRATE JUDGE

Instrumentality Protocol

13